In this case, I've submitted the brief talking about a fatal variance, talking about an amendment. And I think that argument blends into the other two arguments about sufficiency and the prejudicial evidence that was brought in. I think the main complaint that Mr. Wicker has is simply that he has a right to be tried on what the grand jury indicted him for. The prosecutor, I think, did a good job of setting out again in the brief what he was indicted for. And he was tried on things that were other than the things that were in the indictment. The indictment stated the overt acts. And the overt acts basically come down to this about four or five laundry lists of statements that he made about doing nothing but head shots, etc. And receiving a gun. That's what he should have been tried on. He was tried on this case with evidence talking about, for instance, the specific one. There's a conversation where he's discussing with the lead defendant, Robert Adams, a case that Adams has concerning drug dealing in the state court. And his conversations with his attorney about that case. It doesn't have anything to do with what he was indicted for. It has to do with his knowledge of Adams. It has to do with how he knows Adams. But there was plenty of evidence about that. Because all these statements that were admitted, all these overt acts, and the wire cap evidence that was submitted on that, that was presented to the jury, was with Adams. There are some other examples that I cited in my brief about specific instances of Mr. Wicker discussing with Adams. Talking about past exploits. About having shot somebody with birdseed. About having choked somebody. About having come up on someone on an unknown date. And he could have shot him. All unsubstantiated, but more to the point, these were not the overt acts that he was indicted on. These were not anything relevant to the enterprise. The enterprise was proven not only with the testimony of Kavanaugh, but the testimony of the FBI agent and the testimony of the gang detective. That's what was relevant to the enterprise. All these wire tap conversations where Mr. Wicker was discussing these other things had nothing to do with the enterprise. And all they were, the only effect they had was to basically inform the jury that he's a bad guy. That's impermissible. That's not what he was indicted on. And it made the jury believe that he was somebody that had done these things in the past. Again, not what he was indicted for. And even the judge said these things seemed to go in the place of the 404B requirements. Yes, so let me ask you specifically about the issue of sufficiency of the evidence. There's evidence of obtaining a weapon, of obtaining a gun. What is your view of the evidence concerning intent to kill and what makes the evidence, assuming that it's all admissible, what makes it insufficient to demonstrate his intention to use it to kill somebody? Well, the overt acts that he was indicted on, just to go back again, I'll lead into that. The overt, I'm sorry, the acts that the West Coast Crips were supposedly undertaking were murder, drug dealing, robbery, and witness intimidation. There was no evidence of witness intimidation. I focused you on killing. That's what I want to know about. Was there, in your view, because there's a lot, I mean, he does say on the tapes that he wants to kill somebody. Right. So why is that evidence insufficient to demonstrate an intention to kill? Because he doesn't have to be shown to want to do all of those things but only one of those things. And the government's made the point that all they have to do is prove an agreement. But I think that the government has to do more than prove an agreement to do something. They have to show that they made, that Mr. Wicker made an agreement to kill a person, someone. Here, all they have proven, all they allege, and, you know, I'll have to submit that they proved it to a jury, but that's what we're here for, is that they alleged that he was going to kill a rival gang member. Are you arguing that they have to identify the specific individual in order to convict him? I think that they have to identify somebody. I think that they have to. Let me be sure I'm clear on this. So if he had confessed clearly to 11 people, I'm a part of this gang, and tomorrow I'm going to use this gun that's in my hand to go out and kill a member of a rival gang, but I haven't decided who it's going to be. So is that insufficient because you can't identify a specific individual? I think that there has to be something for the jury to go on other than him saying to his friend in the context. No, that's not the question I'm asking. Does the government have to prove who it is, or is it enough that they prove that he intends to kill a person, or do they have to identify who the person is? I think there has to be something more than some unknown rival gang member. I think if he were to say, tomorrow there's going to be a gang of Crips at Lincoln Park, a gang of Bloods at Lincoln Park, and I'm going to go shoot one, okay, that might be sufficient. But that gives it a temporal element rather than an identification of the victim, correct? I think that that is missing from the proof that the government had. There wasn't any temporal element at all. Maybe I should ask this. If you had to write the rule we would apply, what would it be here to determine what needs to be the scope of the threat in order for there to be a claim to overcome the sufficiency of the evidence? Some specificity, be it temporal or to a person. He could have said, you know, Jackson is somebody that I want to kill, and I'm going to wait for him, and I know he hangs out at this place, and whenever I see him there I'm going to go hit him. That might be sufficient. Or like in my example, that might be sufficient. Why would that matter if you don't really care who you kill, as long as it's somebody from the opposite side? Well, here they didn't even prove that there was an opposite side. Now, I'm not here to tell the court that there's no such thing as the Bloods. But here that wasn't proven. In fact, going back to the point I was about to make, there wasn't even any murder by the West Coast Crips proven. There was talk of it, but there was nothing proven. The only murder that was involved in this case was a Crip that was supposedly killed by a Blood. But it's a conspiracy charge, right? Right, it's a conspiracy charge, the agreement. But in a conspiracy charge, and that goes to the cases that were cited concerning the variants. In a conspiracy charge, that gives the prosecutor so much power because all they have to do is prove an agreement. But an agreement to do what? And that's what I'm trying to get to here, is just an agreement to kill someone some day. I don't think it's sufficient. I think there has to be some specificity to it. It can't be simply an unknown rival gang member. It can't be simply an allegation by him that I was walking down the street and I came up behind this guy and I could have done it then. Counsel, you're possibly needing to cede some time for Mr. Wells' counsel. Very well. Thank you as well. Thank you. Thank you. We'll hear from Mr. Scott. Good morning, Your Honors. Tim Scott on behalf of Mr. Wells. Your Honors, I'd like to start by discussing the statements that were attributed to Mr. Wells in state court and then circling around and starting with where I began the brief with Ms. Joinder and then hopefully some of the wiretap calls admitted against Mr. Wells. As to the confession that was attributed to him in state court, it's a matter of constitutional law under Crane v. Kentucky that if the government attributes a statement to the accused, then the district court must allow the jury to consider all of the circumstances surrounding that statement in order to afford whatever weight to it it should be afforded in the jury's view. That's a matter of Crane v. Kentucky. That's a matter of 18 U.S.C. 3501. That's a matter of the Ninth Circuit jury instruction 4.1 where the jury is charged with evaluating all of the circumstances surrounding the alleged statement. Does 3501 apply here after Dickerson? Well, I think Dickerson makes it even more important that it's a matter of constitutional law, I would think, if I understand the Court's question. 3501 at once prescribed basically was an attempt to pull back on Miranda, but at the same time did some other things in terms of kind of a statutory safe harbor and also some procedural protections that were in place. And I think, frankly, the state of the law post-Dickerson is that both Miranda exists as a matter of federal constitutional law, but statutorily 3501 exists as well. So I think that both have to be complied with. Frankly, more importantly, though, I think constitutional law alone under Crane v. Kentucky ensures that the jury has to understand and evaluate all of the circumstances surrounding a statement that is attributed to the accused. In this case, the jury was explicitly told to disregard what may have happened in a prior state court proceeding, and that's in the ER at pages 213 and 214. And the prosecutor argued and successfully argued to the district court that it's irrelevant what his motivations were in pleading guilty or in making those statements. Well, of course, it's not irrelevant what his motivations were. That is the heart of the argument and the heart of what the jury had to understand. Now, I'm not going outside of the record here. I'm citing simply to black letter California statutory law. Premeditated attempted murder under Penal Code Section 189 carries a life top. It's a potential life without parole sentence. To say nothing of a gun enhancement under California Penal Code 12022.5, which potentially adds 10 years to a sentence. The import of this is that Mr. Wells was facing decades, if not a life with parole sentence for attempted murder, and had the opportunity to resolve his case for the effect of one year in custody. I say that because it was a four-year deal at halftime for two years, and he'd already served nearly a year in custody. My simple proposition is that when the jury is evaluating statements attributed to him and incriminating statements, they should know whether or not he made those statements for the benefit, for the inducement of getting out of custody in one year with a potentially life sentence hanging over his head. The jury simply ought to know that to carry out their charge of evaluating how much weight to give to the evidence. Briefly to touch on if there was harmlessness, because the government doesn't really argue as a matter of law that that was properly excluded. That kind of evidence was excluded. They simply say, well, the jury did know some of those facts. What the jury never heard was how much time was involved, the specific inducement he was given to make those statements. And importantly, the jury requested and received a readback of only that first testimony, Mr. Wells' colloquy in state court. And after they got that readback, they convicted him in short order. I add that to the proposition, and this is in the record, that his state court case ended in a 10-2 deadlock for acquittal and used the totality to argue that certainly the government can't argue beyond a reasonable doubt that this was harmless error. As to Ms. Joinder, the district court made specific findings of fact, and this is page 56 of the ER, that there were distinct conspiracies here. The government doesn't allege, and the evidence certainly never showed, that Mr. Wells and Mr. Wicker were common conspirators towards a particular criminal act. There's no allegation that they participated in any common crime. So the concern is that they have to participate in a common crime to be part of the same conspiracy. They have to be part of the same conspiracy. Correct. That's why I asked the question. Right. But the government doesn't have to prove that they jointly participated in a single crime, other than the conspiracy itself. Correct. If, and it's a big if because it doesn't exist in this case, if they're charged with a common conspiracy, whether that's a general conspiracy under any particular criminal statute or a RICO conspiracy under 18 U.S.C. 1962, sub D, if they're charged in a common conspiracy, then they can participate in different overt acts. That's true. That's a different Assuming there's a single gang conspiracy to kill, get the drug business, et cetera, et cetera, the fact that they might go out individually and commit crimes alone in furtherance of that wouldn't disqualify them from conviction. Probably not necessarily if, again, assuming it's part of the same gang conspiracy. What's different than that, and what was charged in this case, was simply a statutory definition that they were alleged to have participated or alleged to claim membership in an enterprise, which is a different thing than a conspiracy. They just said they're both West Coast Crips, which I would note factually, the record was clear, consists of some 500 members, and the expert that the government employed was candid that it's sort of a very fluid membership. Members come, members go. There's different varying levels of involvement. So to say that because anyone is affiliated or alleged to be affiliated with a statutory definition of an enterprise, that's a different proposition than saying that someone who is actually alleged to participate in the same conspiracy can be properly joined. There's no particular conspiracy here. Correct. It's the membership is the predicate. That's what the government has to rely on, but there are no cases that I'm familiar with that construe it that broadly. I mean, we'd be left in a position, frankly, by simply saying you're both Crips. Someone's bank robbery on an unrelated date could be alleged, along with somebody else's drug deal on a different date. They could span potentially different years of participation. If the only commonality is this alleged membership in something that can be argued statutorily as an enterprise, that is a dramatic broadening of the joined rules. Taking your point for the purpose of going forward, that these are two separate conspiracies. Correct. They're not charged as overlapping conspiracies. They're two separate conspiracies. The commonality really is the membership in the same gang. How did the wrongful, in your view, wrongful joinder harm your client? Well, the main problem was that there was overwhelming and very prejudicial evidence that was brought to bear against Mr. Wells. Mr. Torres described somewhat, and I set out in my briefs, the exact nature of some of this evidence, and it's disturbing beyond anything that I've seen in case law in terms of blowing people's brains out, in terms of going on a shooting spree. You're talking about the wiretaps. I'm sorry? You're talking about the wiretaps. I'm talking about the wiretaps. I'm also talking about live witness testimony, talking about finding shotguns and 9mm weapons and bulletproof vests and sort of this military-sounding equipment and observations of people conspiring to commit murder. And you're saying this evidence simply would not have come in had your client been tried by himself. Correct. And the government conceded that that wouldn't be admissible against Mr. Wells. Let me speak to limiting instructions, because the government, I think, relies heavily on limiting instructions to say this is an error. I need to point out that the government, on page 30 of their brief, sets out a string cite of different limiting instructions. And what I want to say is if you look at page 30 of the government's brief and look up those cites, it tells a different story. I'm not accusing the government of anything other than making an error. But each of the limiting instructions that they cite on pages 123, 137 and 8, 142, 145, and 149 of the ER, those limiting instructions say you can use this evidence only as enterprise. But that's to Mr. Wells and Mr. Wicker. Those are not limiting instructions that say you can't use it against Mr. Wells. That's a matter of the record as it's cited in the government's brief. And I respectfully urge the Court to please take the government up on their offer to look at the cites. Were there other limiting instructions that did distinguish between the two? Later. Later there were some instructions, but they're not on the scale that they appear in the government's brief, and they were sporadic. And it was after hour upon hour and day after day of this prejudicial testimony. I set out a number of occasions, and it's literally hundreds of pages of transcript, where there was evidence that's admittedly offered or admissible only against Mr. Wicker, but that no limiting instruction accompanied it. So my point is that there was a lot of evidence that was not cross-admissible that didn't have limiting instructions. Most, or if not all, of the limiting instructions the government cites weren't limiting instructions as to Mr. Wells, and then the ones that the government did cite, but I admit do exist in the record, are later, are fewer, and are sporadic. I cite to the Satterfield case where this Court, and that was a misjoinder of bank robbery charges, and this Court held squarely that limiting instructions didn't overcome the prejudice in that case because Mr. Satterfield was forced to stand trial with somebody who was improperly joined with another person who had participated in different acts. Now in the Satterfield case, if you read the facts, there is no talk about blowing people's brains out and shooting sprees and murders. It's far less prejudicial factually than what Mr. Wells' jury and Mr. Wells was subjected to. So as a factual matter, there's overwhelming prejudice as to the misjoinder. I don't know if I can reserve time or not. You're out of time, but we'll give you a little bit, both of you, for some rebuttal time. Very well. I appreciate that. After we hear from the government. Good morning. Linda Frakes of the United States for the appellee in this case. Let me start first with just addressing the limiting instruction and maybe a distinction I think that should be noted by this Court and for the record about how the limiting instructions were generated. You're talking about Mr. Wells now. Mr. Wells, yes. And there was a distinction about when the wiretap evidence came in to prove, as the judge found was appropriate in this case, to prove evidence of the enterprise. And that enterprise evidence was relevant for the case against Wicker and Wells, and it was admissible for that. Now, there was other wiretap evidence that was put on on other days of the trial proceeding, and those wiretap calls went specifically to Mr. Wicker. And the Court instructed the jury, and I can cite to you a couple of occasions when the Court told the jury, this is not to be used against Mr. Wells. I'm sorry. I'm going to tell you the volume and the page number as opposed to the ER because we have differing ones. It's volume 5, page 701, where they specifically say that you're about to hear evidence of wiretap conversations that are not admissible to Defendant Wells. It is not admissible to Defendant Wells. And then again on page 703. And what follows, and every time a call is played, they're just played one right after the other. He doesn't repeat that same limiting instruction every single time, but he gets these two limiting instructions and then they go right into the series of ten or so calls that were only with respect to what Wicker was doing at that time and not Mr. Wells. So I think... And were these the calls in which Mr. Wicker was a participant because there were... Yes. Okay. Yes. I will say there was probably a couple calls where it was to Dean Hughes. Dean Hughes testified, however, he was subject to cross-examination about getting the guns. I'm going to give you two more. Put them up. Get the shells ready. Okay. Wicker and I are here on the street. We're going to come up and get those things. Those, that call was to Defendant, or I'm sorry, unindicted co-conspirator Dean Hughes. Okay. During the trial, how were Mr. Wells and Mr. Wicker situated? Were they sitting together at the same table? Your Honor, they were in an L fashion. The jury was to the court's left on the government side. And Mr. Torres and Mr. Wicker sat on the long portion of the L, and then Mr. Wells and his trial counsel, Mr. Leahy, sat on this version. So they weren't just lined up. They were in an L fashion. And were the two defendants at the close part of the L sitting next to each other? No. I can recall specifically that Mr. Wicker was seated on the counsel's right-hand side. So it would be Wicker, counsel, and then the L shaped. And I don't know if they switched off or not, who sat on the other side. But they were not seated. This is not necessarily a critical question, but I'm trying to put myself in the position of the jury as they're just hearing this, trying to figure out are these guys somehow guilty of the other people's crimes. Why did you join these two defendants for trial? Well, Your Honor, the overwhelming evidence that the government had, the elements that the government had to prove in this case was that they were members of this gang, that this gang was involved. That wasn't very hard to prove, though, was it? I'm sorry? It was not very hard to prove that they were members of the gang. Well, it was contested. It was easier. It wasn't overwhelmingly difficult. But I still had to show that the enterprise was in existence prior to the times alleged that these violent crimes were taking place. And the nature of the gang was common evidence as to the both of them. Yes. Now, their individual memberships as to why or how we knew that each one was a member, I guess, was probably not common to both of them. Right. They were documented separately at different times. There was – Okay. So the commonality of the existence of the gang, what other reason do you have for trying them together? Well, you know, these violent crimes that they were both committed were being committed with a common co-conspirator in a relatively short period of time. I mean, the evidence, you know, the events followed one right after another. I mean, the West Coast Crips would commit, you know, violent crime after violent crime,  it wasn't that, you know, one violent crime was committed, and then five years later, you know, or two years later, we have the next violent crime that was being committed that was offered at trial. Now, did you charge any specific crime beyond the conspiracy itself against either of these defendants? The only other specific crime would be there's the actual attempt, because in Mr. Wells' case, I had him also charged with the attempted murder, because he actually shot two people. Right. And lastly, count six of the indictment is the 924C account, 924C account, which is use of a firearm during and in relation to a crime of violence. So that would be something that was different. And I think that the jury was able to understand the difference. Those were essentially the same crimes. This isn't double jeopardy because of the dual sovereign question, but those were essentially the same crimes as to which there had been a hung jury before. Not the use and carrying of a firearm. He wasn't charged that way. Also, here's the difference. I can't say exactly what charge. I don't believe it was something that Wells ever faced on the state court, 50 to life or 25 to life. He was charged with the attempt to murder because nobody died. I think, I'm not an expert on state law, that carries 15 years to a greater, I don't even know what the maximum is. And one of the reasons that was brought up about having the circumstances surrounding those statements, first of all, the admission of that statement is on an abuse of discretion standard, which is not an overwhelming standard to me. And almost all the circumstances, except for the fact, and even Mr. Leahy at some point conceded this, the reason why the court said, no, you can't bring up the fact that there was a hung jury or what happened in state court because that's going to be an undue waste of time. In the state court proceeding, to have gone through and explained all that, that case, Mr. Wells was only tried by himself. He wasn't charged as part of a conspiracy. It was just a sole act that he attempted to kill two people. He wasn't also charged with committing that act with other gang people. And that case was tried differently than the government's case. In the state court case, they put on the tape-recorded statement of Wells' post-arrest statement. In the federal side, I did not do that. I did not put on that. So the theories of how the case could be tried were completely different. And to go through all the minutia of how these two sovereigns tried their case would be an incredible waste of time. And it would just be to ask for some type of jury nullification. Listen, jury, we got into this. Another jury who's heard these same facts, the same event, they hung. And guess what? It was 10 to 2. So you guys be as smart as them. And don't find a conviction based on the facts in this federal case. So they're separately charged. The incident's the same, but the way that it was charged was different. I'd like to go back to where you started with the instructions that various of these statements can be used solely for the enterprise. And, of course, it relates to both of them. Am I correct that basically for admission of those statements, the government's theory is that you just have to show that there's this general agreement among the WCC members to retaliate, well, to maintain their presence as an enterprise and to retaliate against some rival gang? Is that the essence? That and the motivation. I mean, that's a very important factor. And what I think some of these enterprise calls show is that there's a group of individuals that they agree to be associated together. They agree that they're going to commit violent crimes, that this group of individuals have agreed that they're going to be conducting acts that are defined as racketeering acts. I mean, the goals of the West Coast Crips are to do drug dealing, to do murders, especially of rival gang members, to protect their turf. There's a hierarchy. There are roles that you have within this organization. And if you want to up your ante in this gang, then you're going to have to go out and prove yourself. You're going to become a writer. Maybe after a writer, you can be a shot caller and make decisions for the gang. You can be an OG if you live long enough and be well respected in the gang. So that would be – that was how the calls came in. You know, I guess my question is in light of the Garcia case, which tries to caution us against these general – you know, when you have testimony that you have the gang and there's going to be crimes and they're all bound together for basically the purpose of spitting out various crimes. But at the end of that case, it basically says, you know, that isn't enough, because otherwise you've extended this web way too far. Basically any crime that occurs, you know, whether it's peddling with an illegal license, would come into the gang conspiracy. Why doesn't that case restrict what could come in here? Well, I think you have to also look at the statute of how it's charged under. The evidence didn't come in as to anything other than to prove racketeering activity that was conducted and that there's a specific definition to racketeering activity. It's just not anything – you know, it's not throwing dice or, you know, alien smuggling. It's specific racketeering activity. In addition, in an enterprise, you have to go with – in this case, you had to prove – the government had to prove that there were specific violent crimes, not just any crime. Bank robbery, for example. Robbery is actually one of the racketeering activities. But I came up with alien smuggling as something that comes to the top of my head for, you know, criminal activity that, you know, I wouldn't be able to bring in. Nor was there evidence of that. The evidence came in only to go – to prove the existence of racketeering activity. What was the motive of the gang? What were their purposes? How did the gang start? You know, it was boasted that the West Coast Crips, they started the walk-ups. And that's what the enterprise calls actually went to. They described the rivals, how the rivals wear red and the Crips have their blue rags. They discuss how, you know, the motivation. There's a specific call on July 11th where one of the conspirators says, you know, eye for an eye, what you do to me, we do to you. How many of these calls would have been admissible if Mr. Wells had been tried alone? If he would have been tried alone, I would have only moved to admit the enterprise calls, because that's still my group. How many of the calls? There were 12. And those calls were between who and whom? Those – I'm sorry? Those – who were the – who was talking in those? I can tell you're on it. These were almost all of them between Robert Adams and Mr. Wicker. There's about half of them. There was a couple calls with Mr. Wood, Robert Wood. He was the other co-conspirator charged in this case. Between Mr. Wood and whom? And Adams. Mr. Adams is on all these calls. And why are they admitted if Mr. Wells is not participating in the conversations? Well, these still – because they still show the enterprise conspiracy, that this is an enterprise, that they are in agreement to conduct racketeering activities that occurred prior to this time. So you'd have to then prove separately that he opted in. But your position, as I understand it, is notwithstanding the fact that you have to put in extra, separate evidence demonstrating specifically that Wells intentionally joined up, you could use this evidence to show what it was he joined up to do. Right. What was the agreement? What was the gang supposed to do? What was he agreeing to do when he became a member of that gang? It wasn't to go sell the Girl Scout cookies. It was to go out there and commit violent crimes to protect their turf, to promote their gang. And these calls go in and they describe exactly, you know, what they do. It talks about, again, how they, you know, how they're – this is, you know, professional, that when you're going to do a walk-up, when you're going to do a walk-up shooting, you should have a car nearby to get to. I mean, because this is how professionally we're – as gang members, we're professional, and this is how we should get it done. So I think that those calls would still come in. The calls that it would be, I would say, an undue waste of time to go into the calls that, as limiting instruction said, went only to Mr. Wicker with respect to getting the guns from Dean Hughes and that specific part with Mr. Wells. Would it be more than a waste of time? Would they have been simply inadmissible as prejudicial? I would not disagree with that statement, Your Honor. So we should probably regard them as prejudicial in the context of this case. The question is whether they were unduly prejudicial and should have been excluded or whether they should have gone to the question of severance, whatever. But those calls hurt him, and they never would have come in had they been tried separately. I would agree, Your Honor. And it would be – and, again, it's – You're basically relying on the limiting instructions on pages whatever they were. Right. And I would just point out that that information, those limiting instructions, came right before those series of calls. It wasn't like they gave a limiting instruction, and then later on we put the calls in. I mean, those went right to the very heart. As soon as he heard the limiting instruction, it was – the calls came in. And also, I mean, it was the way – I know the transcripts have been made of the closing arguments. It wasn't argued inappropriately about what evidence went in just to Mr. Wells and what evidence that the jury should direct its attention to just for Mr. Wicker. You know, the Court read its standard jury instructions about separate crime, separate defendant, separate charges. Mr. Wells is only in charge, you know, counts one, two, three, and six. Mr. Wicker is only in count four. So that's the government's position as to that. Did you want to respond at all to Mr. Wicker's? On the sufficiency? Yes. Yes, Your Honor. I think this was an overwhelming case, especially, again, as we must view the evidence in the light most favorable to the government. The government proved the elements of the case against him, that the criminal organization exists, that the organization engages in racketeering enterprise, that he committed a violent crime, and the purpose was to promote his position within the West Coast Crips. The evidence was the testimony from Detective Carter about the gang. We had Dean Hughes testify about the gang. I think if I could focus you a little bit more, it seems to me that Mr. Torres was arguing that the defect in the evidence was that there was no demonstration that Mr. Wicker had anybody particular in mind to kill. And I'd like your response to that argument. Thank you, Your Honor. There is a State court case, I'm not familiar with the Federal case, to say that you don't have to actually name the person. It was in the annotations to conspiracy to commit murder, and I don't have it, I'm sorry, for State cases. But in the Federal case, in this case, the government only had to prove that there was an agreement, that he intended, that he wanted to go and kill someone. Does an agreement here mean the same thing as an enforceable contract? An unenforceable contract? An enforceable contract. Is agreement here the same thing as a contract? Well, I think in a contract there's more of a bargain for exchange. I mean, you're going to do something and you're going to get something in return. So you're saying that even if it's not a contract, it can be an agreement? I guess it could be. I mean, I don't really see. The definition of agreement usually is not at issue in these conspiracy cases, but it occurs to me that, for example, if you and I were to have the following exchange, I'll refrain from characterizing it. I say to you, if you give me a dollar, I promise to do something nice for you someday. Is that a contract? Well. First your contract's law probably says no. Yeah. That is to say there's not a specific thing that I've agreed to. And so I say, if you give me a dollar, I promise to kill somebody someday. Is that a contract? Okay. In that instance I would say no, but that's not the facts and that's not what Mr. Wicker articulated in the phone calls with respect to who he wanted to kill. He talked about there being a major gang war going on this summer, that he wanted to get a gun so that he could go out and commit a shooting. And, in fact, I think the evidence, circumstantial that it was, still showed that he received a gun from Mr. Adams on July 11th. We have very clear testimony about that. Takes the gun, puts it on his pants. We know that. Okay. And he discussed how he wanted to, you know, he was going to go out on the street, that he was still cripping, and he talks about it, not in some far-off time, but he talks about it being a major gang war that's going on this summer. And these calls are coming in during the summertime. He's not talking about a future summer. He's talking about this summer. And he wants to come out cripping. So, you know, you look at the explicit details of how he wants to do it and who he wants to do it to, I think the evidence is sufficient to find, in the light most favorable to the government, that there was an agreement that he wanted to shoot an unnamed rival gang member, and in furtherance of that agreement, Adams said, Yes, and I'll get you a gun, I'll get you a gun by the end of the week. And we believe that he did. So I think that would show that he intended to carry it out, and it wasn't something that was to be done at some unknown time. I mean, the call was about that summer. I hope that answers your question on the sufficiency of the evidence. Thank you. Is there any other issues that the court would like the government to address with respect to issues raised? I think we're finished with our questions. Thank you. Thank you. Although you used up your time, I want to give both of you an opportunity to rebut. I'll give you each a minute to rebut. I appreciate that. Thank you, Your Honor. I wanted to make the point that, you know, the other part of the indictment, it called him a shot caller and a writer. There was no evidence that he directed the activities of any other person except for his little brother. The point about this, the other evidence that came in, if that had not come in, if he was just charged on what he was charged with, it would have boiled down to Dean Hughes, the man who was on dialysis and was served at dialysis and basically was facing a life sentence because he probably wouldn't make it out of prison if he went to prison and he wasn't going to prison because he was testifying. And I think the prosecutor made the point about proving the enterprise, the FBI agent, the gang detective, these all were what was there to prove the enterprise. Talking about this major gang war, there was no evidence of any major gang war that summer or any other summer. And I just wanted to make the point, again, about the tenuousness of Dean Hughes' testimony because, remember, there was no gun ever found. With that, I'll submit it. Thank you. Thank you, Counsel. We'll hear finally from Mr. Scott. Thank you for the time, Your Honor. I'd like to pick up with the question that Judge Fletcher posed. Was the other evidence, the quote-unquote 12 enterprise calls, properly admissible? The government said that it would be. And we say, of course, that it would not be. And here's why. The government's theory, as for those other 12 calls, was that they went, quote-unquote, to show enterprise. There is no to show enterprise exception to the rules against hearsay. There has to be a hearsay exception of some sort to get that information into evidence. Please recall that Mr. Wells was in custody as of January 2001. There's a co-conspirator exception, though, isn't there? There is. And just to finish my factual thought, none of those calls came while he was on the street. All of them happened after he was in jail, and that particular conspiracy had ended. As to 801 D2E, in the trial court, and this is memorialized on pages 49 through 51, and then later at 149, 166, and 643, the district court did not admit those calls. Did not admit those calls as co-conspirator statements. He said they, quote-unquote, go to enterprise. He never made any findings of fact under Borjali or under Peralta. He never made the factual record that you need to to suggest they're co-conspirator calls. The reason is they couldn't be. They don't meet that definition under the law. I cited to the court the Gigante case, which aside from the flaw of hailing from east of the Mississippi, it's a Second Circuit case, other than that, it's directly on point and it's directly controlling. It says general common membership in the Mafia is not enough for 801 D2E. There has to be a specific and distinct criminal. This is a little bit different because it wasn't, you know, the Mafia has a lot of families. This was one particular West Coast gang. I guess my question was if they came in under the enterprise and he's part of the enterprise before, are you saying that once he's in jail, that unlike in the conspiracy cases, that they can't come in? Well, and I would respectfully quarrel just briefly about distinguishing Gigante because much like they're separate families within the Mafia, the government's gang expert confirmed that there are different cliques and subsets within the WCC and that it is fluid with varying levels of involvement. So I think in that case it does resemble Gigante or Gigante. But the government still has to meet the legal requirement that it be in furtherance of a common conspiracy. There's also language from this court, you know, in United States v. Smith, that I cite on page 14 of my reply brief, that it has to be the same distinct conspiracy. And in this case, as the district court again found, as a matter of fact, in denying motion to sever, there are distinct conspiracies. So sort of this umbrella theory of admissibility that anything that one alleged member of the Crips says in some context is admissible against any other member of the Crips because of this large umbrella is not supported by law. If at some point the legislature wants to step in and redraft 802.D.1.E. to include language about a statutory enterprise, then so be it. That's a fight for a different day. But 801.D.2.E. today says conspiracy. Gigante in the Ninth Circuit case law says conspiracy. A broad, overarching enterprise doesn't carry the day. And then I cited in the briefs how prejudicial that information was. Thank you, Counsel. The case just argued is submitted, and we appreciate the arguments that all of you presented. With that, we will stand adjourned.
judges: Graber, McKeown, W Fletcher